IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 5:19-CR-00227-CAB |
| ) | |
| Plaintiff, ) | JUDGE CHRISTOPHER A. BOYKO |
| ) | |
| vs. ) | |
| ) | |
| DONALD R. PEYATT, ) | **DEFENDANT'S SENTENCING** |
| ) | **MEMORANDUM** |
| Defendant. ) | |
| ) | |
| ) | |

Now comes the Defendant, Donald R. Peyatt, by and through undersigned counsel, and respectfully requests this Honorable Court consider the attached Memorandum in passing final judgment.

                                        Respectfully submitted,

| | |
|---|---|
| *s/Robert A. Dixon* | *s/Roger M. Synenberg* |
| ROBERT A. DIXON (0022466) | ROGER M. SYNENBERG (0032517) |
| 4403 St. Clair Avenue | CLARE C. MORAN (0081134) |
| Cleveland, OH 44103 | MATTHEW A. KURZ (0097941) |
| (216) 432-1992 | Synenberg & Associates, LLC |
| (216) 881-3928 FAX | 55 Public Square, Suite 1331 |
| Dixonlaws@aol.com | Cleveland, Ohio 44113 |
| | (216) 622-2727 |
| | (216) 622-2707 FAX |
| | lawoffice@synenberg.com |

## **CERTIFICATE OF SERVICE**

    I hereby certify that on August 5, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular US mail. Parties may access this filing through the Court's system.

                                                 */s/ Roger M. Synenberg*
                                                 ROGER M. SYNENBERG

**MEMORANDUM IN SUPPORT**

**I.     PRELIMINARY STATEMENT**

This Sentencing Memorandum is presented to the Court to respectfully advance the reasons why a sentence of probation is appropriate for Mr. Peyatt in this matter.

Mr. Peyatt understands and accepts responsibility for the seriousness of his conduct. Given the circumstances surrounding this case, which are set forth fully below, Mr. Peyatt respectfully submits that a sentence of probation is sufficient but not greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

**II.    STATEMENT OF THE CASE**

Beginning in or around January 2014, the Internal Revenue Service, Criminal Investigation ("IRS-CI") began conducting an investigation into Mr. Peyatt's tax returns for the years 2010 through 2012. As part of IRS-CI's investigation, Mr. Peyatt was interviewed by a Special Agent on or about April 22, 2015. During this interview, Mr. Peyatt knowingly and willfully made a material false statement to the Special Agent.

On May 2, 2019, Mr. Peyatt appeared before this Honorable Court for an initial appearance, arraignment, and plea hearing. Pursuant to a plea agreement, Mr. Peyatt entered a guilty plea to Count 1 of the information in violation of 18 U.S.C. § 1001(a)(2): False Statements.

Mr. Peyatt deeply regrets his conduct and takes full responsibility for his actions. Prior to sentencing, Mr. Peyatt agrees to deliver a certified check or money order to the U.S. Attorney's Office in the amount of $250,000 as restitution in this matter.

The Court's attention is now respectfully directed to Mr. Peyatt's personal history leading up to the present conduct as well as the letters of support from Mr. Peyatt's family and friends. These letters, summarized below, are attached as Exhibits to this Memorandum.

### III. PERSONAL HISTORY

Donald R. Peyatt is 57 years old. He is the second oldest of four children born to Billy Dale Peyatt and Edith Louise (Gadd) Peyatt. Mr. Peyatt's siblings are all deceased.

Mr. Peyatt was born in Richwood, West Virginia. His father was physically abusive to his mother, and both of his parents were alcoholics. When Mr. Peyatt was approximately four years old, his mother left and went to live in Cleveland, Ohio. Mr. Peyatt and his siblings lived with their grandmother and seldom saw either parent. When he was ten years old, Mr. Peyatt's mother brought him and his siblings to live with her in Cleveland, Ohio. Mr. Peyatt received very little guidance while living in an alcohol fueled, volatile household and began living on his own at the young age of 14. He attended West Tech High School in Cleveland, Ohio and withdrew after completing the 8th grade. Mr. Peyatt obtained his GED in 2002.

Mr. Peyatt remained in Cleveland, Ohio until he was 29 years old when he moved to Medina, Ohio. He married his first wife in 1980, and two children were born from the union. At age 39, Mr. Peyatt divorced. He remarried in 1992 and was married until 1997 when his spouse's drug and alcohol use put an end to their relationship. Mr. Peyatt was most recently married in 2001. They remained married until 2017. One child was born from his most recent union.

On April 4, 2002, Mr. Peyatt was sentenced by the United States District Court for the Northern District of West Virginia (Clarksburg) to 87 months in jail with four years of supervised release for a violation of 21 U.S.C. Section 846, 841(a)(1) and 841(b)(1)(B)(ii) – Conspiracy to Possess with Intent to Distribute Cocaine. On September 1, 2004, Mr. Peyatt's

sentence was amended to 46 months incarceration with four years of supervised release. On August 24, 2005, Mr. Peyatt was released from prison and made a promise to himself to never return.

Upon release from prison, Mr. Peyatt worked at Allied Lift and Truck in Cleveland, Ohio earning minimum wage. He left employment with Allied Lift and Truck to start his own business, ESS Services. ESS Services was, and remains, a full service mechanical truck and auto repair shop that also makes service calls to stranded vehicles 24 hours per day. Over the years, Mr. Peyatt's business has grown and has become very successful. As the sole owner of ESS Services, Mr. Peyatt currently employs over thirty individuals.

To understand how Mr. Peyatt has found himself in the present situation requires background on how ESS Services started. Mr. Peyatt formed ESS Services in April of 2006. His responsibilities were the operation of all sales as well as service of equipment for the company. The financial and administrative functions of ESS Services were entirely delegated to his now ex-wife. The operation of the business went along fairly well until approximately 2010 when Mr. Peyatt's independent accountant informed him that he was not receiving completed financial statements to facilitate the preparation of year-end tax returns for the business and which were necessary for Mr. Peyatt's personal returns to be completed. His accountant also advised Mr. Peyatt to hire a qualified internal bookkeeper or accountant to look after the day-to-day operations of his business, as it was growing rapidly. Mr. Peyatt informed his wife of these issues and was assured that she would handle them.

Around the same time (2010), Mr. Peyatt was referred by Mrs. Peyatt to a side business arrangement with an acquaintance of hers in which Mr. Peyatt and acquaintance would sell large

quantities of scrap steel to a scrap-steel purchaser and they would split the proceeds. Unbeknownst to Mr. Peyatt at the time, his wife and her acquaintance were engaged in an affair.

Because ESS Services was growing substantially and the scrap-steel business was providing additional income, Mr. Peyatt informed Mrs. Peyatt that he believed she did not have the experience necessary to run the growing financial operations of the business. Mrs. Peyatt became upset when she heard this news and their relationship began to dissolve. The Peyatt's spousal and personal issues escalated to the point that Mrs. Peyatt would get angry with Mr. Peyatt and lock him and other staff members out of the accounting system for weeks at a time. Mrs. Peyatt informed Mr. Peyatt that if he were to try to hire someone else to take over her position that she would divorce him and shut the company down.

During this time, one of Mr. Peyatt's employees brought to his attention that Mrs. Peyatt was taking cash advances on her own credit cards, paying them off with funds from the company checking account and deducting them as business expenses. In April of 2013, Mr. Peyatt's accountant informed him that he had received a financial statement from Mrs. Peyatt for the year 2009. This statement showed a net-income of approximately $141,000 and credit card expenses of approximately $130,000 shown as a business expense. Mr. Peyatt addressed this situation by informing his wife that credit card payments have to be analyzed and properly classified so that the income amount stated on the tax return is accurate. This was never done.

Mr. and Mrs. Peyatt's relationship deteriorated to the point that they were no longer speaking. Mr. Peyatt was not able to take over or re-assign the bookkeeping functions to a new employee without his wife retaliating. It was discovered that the internal accounting software was not in the name of ESS Services, but in his wife's name. The software company would not release information or passwords to anyone except her. This further complicated Mr. Peyatt's

efforts to understand the company's financial assets and liabilities and to ensure accurate statements and returns were filed.

In early 2014, Mrs. Peyatt locked Mr. Peyatt and office staff out of the accounting system again. Shortly thereafter a team of Internal Revenue Service and Drug Enforcement Administration agents came to ESS Services and confiscated all of the business records including receivables, payables, vendor invoices, and computers. Mr. Peyatt later learned that it was Mrs. Peyatt that made the initial call to the Internal Revenue Service with the intention of starting an investigation, presumably as retaliation.

At this point, Mr. Peyatt engaged the services of an outside bookkeeping firm to take over the functions that were being performed by Mrs. Peyatt. The software company was contacted and proper documentation was provided so they could transfer the software from Mrs. Peyatt's name to ESS Services. Once the external bookkeeping firm took over the office management functions, his wife's employment was terminated. Prior to this, Mrs. Peyatt had filed for divorce.

As part of the aforementioned investigation, Mr. Peyatt was interviewed by an IRS-CI Agent regarding his tax returns and the amount of income he had received from the scrap-steel business. Mr. Peyatt, knee-deep in the actual business side of ESS Services, stated that he kept 5% of the income made from this side business. The government claimed Mr. Peyatt kept 31%, 35%, and 10% of the income in 2010, 2011, and 2012, respectively.

As a result of underreporting his income during the years 2010 to 2012 due to the lack of proper bookkeeping, Mr. Peyatt was assessed lower income tax amounts that he should have been. Mr. Peyatt, having focused so intensely on growing his business, regrets that the accounting suffered in turn.

Mr. Peyatt takes full responsibility for offering a misleading statement regarding the income he kept pertaining to the scrap-steel business. However, it is worthy of note that while locked out of his accounting system, Mr. Peyatt met and exceeded the majority of his financial obligations to the Internal Revenue Service:

> In the year 2011, he owed $71,639 in total taxes. These taxes are paid.
>
> In the year 2012, he owed $157,012 in total taxes. These taxes are paid.
>
> In the year 2013, Mr. Peyatt overpaid $40,795. Of this amount, $36,196 was applied to the taxes owed in 2014.
>
> In 2014, Mr. Peyatt overpaid $165,273 in taxes. Of this amount, $164,546 was applied to the taxes owed in 2015.
>
> In 2015, Mr. Peyatt overpaid $197,405 in taxes. The full amount of overpayment is being applied to the taxes owed in 2016.

(PSR, ¶10-13)

To date, Mr. Peyatt is current on his tax obligations. In fact, the Presentence Investigation shows a current *overpayment* of $197,405. (PSR, ¶66). Because Mr. Peyatt was inundated with the day to day operations of his business and could not access the accounting system, he made sure to *overpay*. The events outlined above are also briefly detailed in a letter from bookkeeper Roberta A. Winner, attached to this Memorandum as Exhibit A.

Despite all of the challenges Mr. Peyatt has faced, he has worked tirelessly to turn his life around, not only to positively affect his own family, but to positively affect the lives of others including his thirty-plus employees.

Those closest to Mr. Peyatt regard him as hardworking, courteous, and honest. These feelings are evidenced by the following letters attached as Exhibits to this Memorandum:

## LETTERS OF SUPPORT

**EXHIBITS:**

| | | |
|---|---|---|
| B-1 | Andy Cali | Friend |
| B-2 | Jim Peyatt | Son |
| B-3 | Tanya Colapietro | Daughter |
| B-4 | Robert L. Gardner | Business Associate & Friend |
| B-5 | John Didonato | Business Associate & Friend |
| B-6 | Kathryn Collier | Business Associate & Friend |

### IV. SUMMARY OF LETTERS

Andy Cali, friend of Donald Peyatt, describes Mr. Peyatt as a "good person, a great businessman, and an even better friend." Mr. Cali met Mr. Peyatt approximately eight years ago when he purchased a forklift from him. Mr. Cali began having issues with the forklift and Mr. Peyatt arranged to pick it up and repair it, no questions asked. Mr. Cali wants this Court to know that Mr. Peyatt "feels terrible" about the current situation and "just wants to move on and prove what a good person he truly is."

Mr. Peyatt's son Jim, describes his father as a "very hard worker." It is not unusual for Mr. Peyatt to work twelve to fourteen hours per day, six to seven days per week. Donald taught his son Jim his business and Jim works for Donald as a Forklift Supervisor. Jim describes how important Mr. Peyatt is to Jim and his siblings. Donald is very active in his grandkids' lives. Jim relates how Mr. Peyatt is "embarrassed" and "feels terrible about his choices." Donald desires a chance to prove to everyone he can do better. Jim disclosed that it would be "very hard" on the family if Donald was away from his kids and grandkids for any period of time.

Mr. Peyatt's daughter, Tanya Colapietro, further echoes son Jim's sentiments. She describes Mr. Peyatt as a "very hard worker" and a family man who uses the time away from his business to be with family. She also paints the picture of a man who knows he made bad choices and wants to prove to everyone that he will do better.

Business Associate and Friend Robert L. Gardner first met Mr. Peyatt when Mr. Gardner was a Supplier for a company that did business with ESS Servicing. Over the years Mr. Peyatt and Mr. Gardner became good friends, "often discussing personal issues, business challenges, successes and failures."

Mr. Gardner has always admired Mr. Peyatt's "sense of urgency" in business matters. He notes that Mr. Peyatt always does the job right the first time, and at a fair price. Observing Mr. Peyatt around his business revealed a man who is willing to share his expertise with his employees and help them learn his trade. About six years ago, Mr. Gardner started his own business and Mr. Peyatt has helped provide him with guidance. Mr. Gardner describes Mr. Peyatt as a "courteous, fair, honest" and "hardworking" individual. He comments upon Mr. Peyatt's integrity and defines it as one of Mr. Peyatt's strengths.

John Didonato met Mr. Peyatt around six years ago when Donald performed service work for Mr. Didonato's company, Atlas Crane. Mr. Didonato describes Donald as an individual with high integrity, both in business and in his personal life. Several times Mr. Didonato has called upon ESS Services for repairs after working hours. Each time Mr. Peyatt would personally come out and do the repairs. Mr. Didonato considers Mr. Peyatt courteous and professional.

Kathryn Collier has known Mr. Peyatt for approximately five years. They have worked closely together on the maintenance of her company's equipment. She believes that Donald is trustworthy and noted that he has always handled their business transactions with honesty and

integrity. Ms. Collier says that Mr. Peyatt has "gone out of his way to help [her] on numerous occasions." She concludes by adding that Mr. Peyatt is a "dependable, honest, and hardworking man."

Evidenced by the letters written on his behalf, Mr. Peyatt is surrounded by a solid support system. Donald's family sees him as a pillar of support in their lives. Mr. Peyatt is taking responsibility for his actions and his loved ones believe that he will continue to learn from his mistakes and prove that he is a better individual.

## V.     LAW AND ARGUMENT

### A. Current State of Sentencing Law in the Wake of *United States v. Booker* and its Progeny

Sentencing procedure underwent a fundamental change with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005).  Whereas the Federal Sentencing Guidelines previously were virtually mandatory in nature, today they are "effectively advisory" in all cases.  *Id.,* at 245.  The net result is that district courts must now impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).  *See United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006) ("It is worth noting that a district court's job is not to impose a 'reasonable' sentence.  Rather, a district court's mandate is to impose a 'sentence, sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2)."); *see also United States v. Ranum*, 353 F. Supp.2d 984, 987 (E.D. Wis. 2005) ("[C]ourts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors.").

The Supreme Court's directive that district courts are to impose sentences in light of ***all*** of the sentencing criteria set forth in § 3553 was made "pellucidly clear" in its decision in *Gall v.*

*United States*, 128 S. Ct. 586 (2007). In *Gall*, the Court rejected both "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range" and "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595. Instead, the Court established the following procedure that district courts are to follow when imposing sentence:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Id.* at 596-597 (citations and footnote omitted); *see also United States v. Grossman*, 513 F.3d 592, 596 (6th Cir. 2008) ("*Gall* shows that the sentencing process involves an exercise in judgment, not a mathematical proof").

Importantly, the "sufficient but not greater than necessary" standard of § 3553 test is no mere guideline. Rather, its sets an independent upper limit on the sentence that may be imposed by a Court. It is often referred to as the "parsimony provision." *See, e.g., United States v.*

*Carey*, 368 F. Supp.2d 891, 895 n.4 (E.D. Wis. 2005); *United States v. Brown*, 356 F. Supp.2d 470, 479 (M.D. Pa. 2005).

As an initial matter, Mr. Peyatt fully accepts responsibility for this offense. He is a non-violent offender who is remorseful and contrite and desires the opportunity to remain in society to continue running his business and live as a productive, law-abiding citizen. A sentence of probation would be "sufficient but not greater than necessary" regarding the current offense conduct.

**Application of the Statutory Sentencing Criteria**

    **1.    The nature and circumstances of the offense and history and characteristics of the defendant.  (18 U.S.C. 3553 § (a)(1))**

In *Pepper v. United States*, 131 S. Ct. 1229 (2011), the United States Supreme Court endorsed the notion that post-*Booker* sentencing must focus as much on the offender, his individual background, and his need for services and rehabilitation as on the offense committed. According to the Court, "highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant." *Id.*, at 1240. (internal citations omitted) After the Guidelines were made advisory, this conduct becomes even more important at sentencing.

Noted above, Mr. Peyatt was previously incarcerated. Upon his release, he promised to himself that he would turn his life around and "do the right thing." Evidenced by his personal history, Mr. Peyatt is unique as a former offender; he was rehabilitated and motivated by his incarceration to lead a highly productive and law-abiding life.

Today, Mr. Peyatt employs more than thirty individuals who in-turn support their families through employment with Mr. Peyatt and ESS Services. Mr. Peyatt's business receives the majority of his attention. The remaining attention is given to his family. There is no one to assume the responsibilities of Mr. Peyatt's business if he is incarcerated for any period of time. The business would shut down and his employees would be jobless.

Mr. Peyatt's background indicates that he is in little need of further rehabilitation by incarceration. He accepts responsibility for his conduct and has already had his life changed by a prior term of incarceration. It is respectfully submitted that a sentence of probation best reflects the appropriate sentence in light of Mr. Peyatt's individual circumstances.

**2. The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence to criminal conduct; to protect the public from future crimes of the defendant; and to provide training, medical care or other correctional treatment. (18 U.S.C. 3553§ (a)(2)(A)-(D))**

When applying the above-referenced factors to the case at bar, it is apparent that a minimum sentence of probation would sufficiently achieve the sentencing goals outlined in 18 U.S.C. § 3553(a).

The facts in this case demonstrate that Mr. Peyatt does not present a danger to the community and it is unlikely that he will engage in any type of unlawful conduct in the future. Mr. Peyatt wishes to continue running his business and providing employment to individuals potentially with prior criminal records who may not be able to otherwise find work.

Since this incident occurred, Mr. Peyatt has had the opportunity to reflect upon his actions as well as the consequences that he would suffer should he engage in any future criminal misconduct. It is respectfully submitted that Mr. Peyatt presents no risk for reoffending. He has admitted his mistakes and has taken measures, such as hiring the appropriate financial

14

professionals, to prevent this situation from presenting itself again. Accordingly, a sentence of probation would more than adequately fulfill the principles and purposes of sentencing contained in § 3553.

Mr. Peyatt's PSR discloses that he has three (3) criminal history points, corresponding to a Criminal History Category II (PSR, ¶ 38-39), further confirming that recidivism is not a concern with respect to Mr. Peyatt. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 (May 2004) (Exhibit 9 showing that recidivism rate for offenders over the age of 50 with a Criminal History Category II is only 13.9% (available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf) (Last accessed August 1, 2019).

It is respectfully submitted that there is no danger that Mr. Peyatt will commit another crime in the future. He only wishes to continue to function in society as both a business owner and a family man. He is of no harm to his community and poses no future threat.

### 3. The kinds of sentences available and Guideline range. (18 U.S.C. § 3553(a)(3)-(4))

As set forth in *Rita vs. United States,* 551 U.S. 338, 351-52 (2007) and *Gall*, *supra*, a district court has discretion to impose a sentence below the Guidelines range so long as it considers the sentencing factors delineated in § 3553(a).

i. The applicable advisory Guidelines range.

The total offense level for Mr. Peyatt is four (4) with a criminal history category of two (II). (PSR, ¶71) The applicable Guidelines calculation suggests zero (0) to six (6) months of imprisonment, and specifically notes that *a sentence of imprisonment is not required.* (*Id.*) (Emphasis added).

The Pre-Sentence Investigation Report calculated Mr. Peyatt's offense level as follows:

| | |
|---|---:|
| ***Base Offense Level*** | **<u>6</u>** |
| Specific Offense Characteristics: None. | 0 |
| Victim Related Adjustment: None. | 0 |
| Adjustment for Role in the Offense: None. | 0 |
| Adjustment for Obstruction of Justice: None. | 0 |
| Adjusted Offense Level (Subtotal): | 6 |
| Chapter Four Enhancement: None. | 0 |
| Adjustments for Acceptance of Responsibility: | <u>-2</u> |
| **Total Offense Level** | **<u>4</u>** |

(PSR, ¶18-26)

A total offense level of four (4) falls within Zone A. A sentence of imprisonment is not required. A sentence of probation does not fall below the proper Guidelines range and would be most appropriate for Mr. Peyatt in this case.

## VI. <u>CONCLUSION</u>

For all the reasons set forth in this Memorandum, it is respectfully requested that this Honorable Court recognize the unique circumstances at bar regarding Mr. Peyatt. Mr. Peyatt deeply regrets his actions, accepts full responsibility for his conduct, and respectfully requests that the Court sentence him to a term of probation.

Respectfully submitted,

*s/Robert A. Dixon*  
ROBERT A. DIXON (0022466)  
4403 St. Clair Avenue

*s/Roger M. Synenberg*  
ROGER M. SYNENBERG (0032517)  
CLARE C. MORAN (0081134)

16

Cleveland, OH 44103  
(216) 432-1992  
(216) 881-3928 FAX  
Dixonlaws@aol.com

MATTHEW A. KURZ (0097941)  
Synenberg & Associates, LLC  
55 Public Square, Suite 1331  
Cleveland, Ohio 44113  
(216) 622-2727  
(216) 622-2707 FAX  
lawoffice@synenberg.com